**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (*Pro Hac Vice*)
Brittany M. Michael *(Pro Hac Vice)*
Gail Greenwood (*Pro Hac Vice*)
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, California 94104-4436
Telephone: 415-263-7000
Email: jstang@pszjlaw.com
bmichael@pszjlaw.com
ggreenwood@pszjlaw.com

-and-

**LEMERY GREISLER LLC**
Paul A. Levine, Esq.
677 Broadway, 8th Floor
Albany, New York 12207
Telephone: (518) 433-8800
Email plevine@lemerygreisler.com

*Counsel to the Official Committee of Unsecured Creditors*
Attorneys for the Official Committee of
Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF VERMONT**

| | |
|---|---|
| In re<br><br>ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT,<br><br>Debtor. | Case No. 24-10205 (HZC)<br>Chapter 11 |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>Plaintiff,<br><br>vs.<br><br>ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT; BISHOP JOHN J. McDERMOTT; RICE MEMORIAL HIGH SCHOOL; MOUNT ST. JOSEPH HIGH SCHOOL; CHRIST THE KING - ST. ANTHONY PARISH, BURLINGTON; ST. JOSEPH CO-CATHEDRAL, BURLINGTON; ST. MARK PARISH, BURLINGTON; ST. AMBROSE CHURCH, BRISTOL; ST. MARY CHURCH, CAMBRIDGE; OUR LADY OF MT. CARMEL CHURCH, CHARLOTTE; OUR LADY OF GRACE PARISH, COLCHESTER; ST. PIUS X CHURCH, ESSEX JUNCTION; HOLY FAMILY - ST. | Adv. Proc.<br><br>**COMPLAINT FOR DECLARATORY RELIEF, AVOIDANCE OF FRAUDULENT TRANSFERS, AND TURNOVER** |

LAWRENCE PARISH, ESSEX JUNCTION; ST. JUDE CHURCH, HINESBURG; HOLY CROSS PARISH, COLCHESTER; ST. ANN PARISH, MILTON; OUR LADY OF THE HOLY ROSARY PARISH, RICHMOND; ST. CATHERINE OF SIENA, SHELBURNE; ST. JOHN VIANNEY CHURCH, SOUTH BURLINGTON; OUR LADY OF THE LAKE PARISH, SOUTH HERO; ST. THOMAS PARISH, UNDERHILL CENTER; ST. PETER PARISH , VERGENNES; IMMACULATE HEART OF MARY PARISH, WILLISTON; ST. FRANCIS XAVIER, WINOOSKI; ST. CHARLES PARISH, BELLOWS FALLS; OUR LADY OF THE VALLEY PARISH, RANDOLPH; ST. MICHAEL ROMAN CATHOLIC CHURCH, BRATTLEBORO; HOLY NAME OF MARY PARISH, PROCTORSVILLE C/O LUDLOW; OUR LADY OF MERCY, PUTNEY; HOLY FAMILY PARISH, SPRINGFIELD; ST. ANTHONY'S PARISH, WHITE RIVER; OUR LADY FATIMA, WILMINGTON; ST. FRANCIS OF ASSISI PARISH, WINDSOR; OUR LADY OF THE SNOWS, WOODSTOCK; CHRIST OUR SAVIOR PARISH, MANCHESTER CENTER; ST. JOHN THE BAPTIST PARISH, NORTH BENNINGTON; ST. JOACHIM PARISH, READSBORO; SACRED HEART ST. FRANCIS DE SALES, BENNINGTON; ST. MONICA PARISH, BARRE; OUR LADY OF PERPETUAL HELP, BRADFORD; ST. FRANCIS OF ASSISI, NORWICH; OUR LADY OF LIGHT, SOUTH STRAFFORD; ST. EUGENE, WELLS RIVER; MARY QUEEN OF ALL SAINTS, HARDWICK; ST. AUGUSTINE PARISH, MONTPELIER; THE MOST HOLY NAME OF JESUS PARISH, MORRISVILLE; ST. JOHN THE EVANGELIST PARISH, NORTHFIELD; BLESSED SACRAMENT CATHOLIC CHURCH, STOWE; OUR LADY OF THE SNOW AND ST. PATRICK'S PARISH, WAITSFIELD & MORETOWN; ST. ANDREW PARISH, WATERBURY; MOST HOLY TRINITY PARISH, BARTON; MATER DEI PARISH, DERBY LINE; CORPUS CHRISTI PARISH, ST. JOHNSBURY; ST. ANDRE BESSETTE PARISH, TROY; ST. MARY PARISH CHARITABLE TRUST, BRANDON; ST. BERNADETTE AND ST. GENEVIEVE PARISH, BRIDPORT C/O MIDDLEBURY; ST. JOHN THE BAPTIST PARISH, CASTLETON; OUR LADY OF SEVEN DOLORS PARISH, FAIR HAVEN; ANNUNCIATION OF THE BLESSED VIRGIN MARY, LUDLOW; ASSUMPTION OF THE BLESSED VIRGIN MARY (ST. MARY'S) PARISH, MIDDLEBURY; ST. FRANCES CABRINI PARISH, WEST PAWLET; ST. PAUL PARISH, ORWELL C/O CASTLETON; ST. ALPHONSUS, PITTSFORD; ST. RAPHAEL PARISH, POULTNEY; ST. DOMINIC PARISH, PROCTOR; CHRIST THE KING CHURCH, RUTLAND; ST. PETER, RUTLAND; ST. PATRICK PARISH, WALLINGFORD; ST. BRIDGET PARISH, WEST RUTLAND; ST. STANISLAUS KOSTKA PARISH, WEST RUTLAND;

ST. JOHN THE BAPTIST, ENOSBURG; ST. LUKE, FAIRFAX; ST. PATRICK PARISH, FAIRFIELD; ST. ISIDORE PARISH, MONTGOMERY C/O RICHFORD; ALL SAINTS PARISH, RICHFORD; OUR LADY OF LOURDES PARISH, EAST BERKSHIRE; IMMACULATE CONCEPTION PARISH, ST. ALBANS; ASCENSION PARISH, GEORGIA C/O FAIRFAX; ST. ANTHONY PARISH, SHELDON SPRINGS; ST. MARY'S, FRANKLIN; CHURCH OF THE NATIVITY - ST. LOUIS PARISH, SWANTON; ST. ANTHONY ST. GEORGE PARISH, FAIRFIELD; CHRIST THE KING SCHOOL, BURLINGTON; ST. FRANCIS XAVIER, WINOOSKI; ST. MICHAEL SCHOOL, BRATTLEBORO; SACRED HEART SCHOOL, BENNINGTON; ST. MONICA - ST. MICHAEL SCHOOL, BARRE; ST. PAUL'S CATHOLIC SCHOOL, BARTON; CHRIST THE KING SCHOOL, RUTLAND; GOOD SHEPHERD CATHOLIC SCHOOL, ST. JOHNSBURY; ST. THERESE DIGITAL ACADEMY, BURLINGTON; and DOES 1 THROUGH 20, being intended to name any other parishes whose true name and identity is not yet known,

Defendants.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....... 1

JURISDICTION & VENUE ....... 3

THE PARTIES ....... 3

FACTUAL BACKGROUND ....... 5

A. The Diocese's Bankruptcy ....... 5

B. The Legal Structure of the Diocese and Its Operating Divisions ....... 6

C. In 2006, the Diocese Created "Parish Trusts" to Shield Assets From Creditors. ....... 7

The Diocese Is a Beneficiary of the Parish Trusts ....... 8

The Bishop Controls the Trust Assets ....... 9

The Diocese Transferred Assets Worth Millions to the Parish Trusts ....... 10

Creditors of the Diocese as of the Petition Date ....... 11

D. The Parishes Are Not Separate Legal Entities. They Are Operating Divisions of the Diocese. ....... 12

E. The Parishes Have No "Independent" Governance ....... 14

F. The High Schools Are Not Separate Legal Entities. They Are Operating Divisions of the Diocese. ....... 15

FIRST CLAIM FOR RELIEF ....... 16

SECOND CLAIM FOR RELIEF ....... 16

THIRD CLAIM FOR RELIEF ....... 18

FOURTH CLAIM FOR RELIEF ....... 19

FIFTH CLAIM FOR RELIEF ....... 20

SIXTH CLAIM FOR RELIEF ....... 21

## INTRODUCTION

1. The Roman Catholic Diocese of Burlington (the "Diocese") is disguising its ownership of hundreds of millions of dollars of assets in an attempt to place them beyond the reach of this Court and to keep them from the Diocese's creditors, principally survivors of child sexual abuse ("Survivors"). The Diocese claims (i) that its parishes and schools are unincorporated associations, separate from the Diocese, and (ii) assets associated with its parishes and schools are held in individual trusts shielded from claims of Survivors. These claims are demonstrably false.

2. The Official Committee of Unsecured Creditors ("Committee") seeks declaratory relief to correct the record and to clarify the scope of the bankruptcy estate. The Committee will demonstrate that the parishes and their related parochial schools ("Parishes") and two high schools ("High Schools") are not legally separate entities and are, and have always been, "operating divisions" (collectively, the "Operating Divisions") of the Diocese. Like operating divisions in any corporation, the Operating Divisions may account separately for individual operations, including assets and employees dedicated to the divisions' activities, but doing so does not change the true legal nor equitable owner of the assets — the Diocese. The Diocese used its own property to create and fund certain individual charitable trusts (the "Parish Trusts") that remain under the unfettered control of the Diocese for its own benefit, constituting self-settled trusts. The assets of these self-settled trusts are available to satisfy the claims of Survivors against the Diocese.

3. As an alternative to declarations that the Operating Divisions and their assets are part of the Diocese and its bankruptcy estate and held in self-settled trusts, the Committee seeks to avoid and recover the Diocese's transfer of significant assets into the Parish Trusts. The trust transfers should be avoided as actually fraudulent because the Diocese intended to avoid collection by pending and future sexual abuse creditors, and the trust transfers should be avoided as constructively fraudulent because the Diocese received nothing from the Parish Trusts in exchange for the transfers and the Diocese was insolvent or rendered insolvent as a result of the transfers.

4. The defendants in this adversary complaint are the Diocese, the Operating Divisions, and the Bishop in his capacity as trustee of each of the Parish Trusts.

5. By this adversary proceeding, the Committee seeks the following relief:

- a declaration that as of the Petition Date (September 30, 2024), each Parish and High School was and is an operating division of the Diocese and continues as such;
- a declaration that all assets of the Operating Divisions are property of the bankruptcy estate;
- a declaration that the Parish Trusts are self-settled trusts subject to claims by the Diocese's creditors;
- a judgment that transfers made to the Parish Trusts are avoidable as intentionally or constructively fraudulent, and recoverable by the Diocese's estate for the benefit of creditors;
- a judgment requiring turnover of the assets in the Parish Trusts, including all income derived therefrom, to the Diocese and its estate.

6. The Operating Divisions never held legal title to their purported assets because they are not separate civil legal entities. Since the creation of the Parish Trusts, legal title is held either by the Diocese or by the Parish Trusts. In other words, self-settled trusts created, funded, and controlled by the Diocese for the benefit of the Diocese. A declaration that the Operating Divisions are part of the Diocese, and that their interests in assets are, in fact, interests of the Diocese's estate, is critical to any equitable plan of reorganization to fairly compensate the Survivors. Even if the Operating Divisions are separate, which the Committee disputes, the Diocese's transfer of assets to the Parish Trusts for no consideration should be avoided and recovered by the bankruptcy estate.

7. Absent a declaration that the Operating Divisions are part of the Diocese and that the Parish Trusts' assets are available to pay Diocesan creditors, the Diocese will continue to evade its moral, financial and legal responsibility to the Survivors.

## JURISDICTION & VENUE

8. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and Federal Rule of Bankruptcy Procedure 7001.

9. Venue in this judicial district is appropriate pursuant to 28 U.S.C. § 1409. This adversary proceeding arises under and in connection with a case under chapter 11 of the Bankruptcy Code that is pending in this judicial district.

10. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A)(E) and (O).

11. The Committee consents to entry of final orders and a final judgment by this Court in this adversary proceeding.

## THE PARTIES

12. On October 22, 2024, the United States Trustee appointed the Committee to represent the Diocese's unsecured creditors pursuant to 11 U.S.C. Title 11 (the "Bankruptcy Code") § 1102(a)(1). The Committee consists of five individuals who were minors when they were sexually abused by perpetrators for whom the Diocese was responsible. The Committee is the plaintiff and a party in interest pursuant to Bankruptcy Code § 1109(b). The Committee has standing and authority to bring this action pursuant to the Court's *Order Granting Leave, Standing, and Authority to the Official Committee of Unsecured Creditors to Prosecute Certain Causes of Action on Behalf of the Debtor and Its Estate* [Docket No. 844] ("Standing Order").

13. The Diocese is a debtor and a debtor-in-possession. It continues to operate its business and remains in possession of its properties pursuant to Bankruptcy Code §§ 1107(a) and 1108. No trustee or examiner has been appointed in the case.

14. The following are Parishes: Christ The King - St. Anthony Parish, Burlington; St. Joseph Co-Cathedral, Burlington; St. Mark Parish, Burlington; St. Ambrose Church, Bristol; St. Mary Church, Cambridge; Our Lady of Mt. Carmel Church, Charlotte; Our Lady of Grace Parish, Colchester; St. Pius X Church, Essex Junction; Holy Family - St. Lawrence Parish, Essex Junction; St. Jude Church, Hinesburg; Holy Cross Parish, Colchester; St. Ann Parish, Milton; Our Lady of The Holy Rosary Parish, Richmond; St. Catherine of Siena, Shelburne; St. John

Vianney Church, South Burlington; Our Lady of The Lake Parish, South Hero; St. Thomas Parish, Underhill Center; St. Peter Parish , Vergennes; Immaculate Heart of Mary Parish, Williston; St. Francis Xavier, Winooski; St. Charles Parish, Bellows Falls; Our Lady of The Valley Parish, Randolph; St. Michael Roman Catholic Church, Brattleboro; Holy Name of Mary Parish, Proctorsville c/o Ludlow; Our Lady of Mercy, Putney; Holy Family Parish, Springfield; St. Anthony's Parish, White River; Our Lady Fatima, Wilmington; St. Francis of Assisi Parish, Windsor; Our Lady of The Snows, Woodstock; Christ Our Savior Parish, Manchester Center; St. John The Baptist Parish, North Bennington; St. Joachim Parish, Readsboro; Sacred Heart St. Francis De Sales, Bennington; St. Monica Parish, Barre; Our Lady of Perpetual Help, Bradford; St. Francis of Assisi, Norwich; Our Lady of Light, South Strafford; St. Eugene, Wells River; Mary Queen of All Saints, Hardwick; St. Augustine Parish, Montpelier; The Most Holy Name of Jesus Parish, Morrisville; St. John The Evangelist Parish, Northfield; Blessed Sacrament Catholic Church, Stowe; Our Lady of The Snow And St. Patrick's Parish, Waitsfield & Moretown; St. Andrew Parish, Waterbury; Most Holy Trinity Parish, Barton; Mater Dei Parish, Derby Line; Corpus Christi Parish, St. Johnsbury; St. Andre Bessette Parish, Troy; St. Mary Parish Charitable Trust, Brandon; St. Bernadette And St. Genevieve Parish, Bridport c/o Middlebury; St. John The Baptist Parish, Castleton; Our Lady of Seven Dolors Parish, Fair Haven; Annunciation of The Blessed Virgin Mary, Ludlow; Assumption of The Blessed Virgin Mary (St. Mary's) Parish, Middlebury; St. Frances Cabrini Parish, West Pawlet; St. Paul Parish, Orwell c/o Castleton; St. Alphonsus, Pittsford; St. Raphael Parish, Poultney; St. Dominic Parish, Proctor; Christ The King Church, Rutland; St. Peter, Rutland; St. Patrick Parish, Wallingford; St. Bridget Parish, West Rutland; St. Stanislaus Kostka Parish, West Rutland; St. John The Baptist, Enosburg; St. Luke, Fairfax; St. Patrick Parish, Fairfield; St. Isidore Parish, Montgomery c/o Richford; All Saints Parish, Richford; Our Lady of Lourdes Parish, East Berkshire; Immaculate Conception Parish, St. Albans; Ascension Parish, Georgia c/o Fairfax; St. Anthony Parish, Sheldon Springs; St. Mary's, Franklin; Church of The Nativity - St. Louis Parish, Swanton; St. Anthony St. George Parish, Fairfield; Christ The King School, Burlington; St. Francis Xavier, Winooski; St. Michael School, Brattleboro; Sacred Heart School, Bennington; St. Monica - St.

Michael School, Barre; St. Paul's Catholic School, Barton; Christ The King School, Rutland; Good Shepherd Catholic School, St. Johnsbury; St. Therese Digital Academy, Burlington; and Does 1 through 20, being intended to name any other parishes whose true name and identity is not yet known. Some of the foregoing Parishes have combined with other named parishes (or formerly named parishes) and are identified in this Complaint under a single name.

15. Each Parish is located within the State of Vermont. Each Parish is unincorporated. The Committee needs further discovery to ascertain the official names of each of the Parishes or whether they have true legal names other than those listed on the Diocese's or Parish's website.

16. Rice Memorial High School ("Rice") is a High School with its principal place of business located at 99 Proctor Ave, South Burlington, VT 05403.

17. Mount St. Joseph Academy ("Mount St. Joseph") is a High School with its principal place of business located at 127 Convent Ave, Rutland, VT 05701.

18. Bishop John McDermott is a natural person who, in the capacity of bishop (the "Bishop"), holds all legal rights that may be exercised by the Diocese and serves as the trustee of each Parish Trust. On information and belief, the Diocese created a Parish Trust for each Parish. The Committee needs further discovery to ascertain the official names of each Parish Trust or whether they have true legal names.

## FACTUAL BACKGROUND

### A. The Diocese's Bankruptcy

19. On September 30, 2024 (the "Petition Date"), the Diocese filed a voluntary petition under chapter 11 of the Bankruptcy Code.

20. The Diocese commenced its bankruptcy five years after the Vermont legislature extended the limitations period applicable to civil lawsuits for childhood sexual abuse. The Diocese's bankruptcy was filed as an abuse case was approaching trial, thereby denying that Survivor the scheduled jury trial of the abuse claims and staying, for an indeterminate time, all other Survivors' jury trial rights.

**B. The Legal Structure of the Diocese and Its Operating Divisions**

21. The Diocese was incorporated as a corporation sole in 1896. Before 2006 and since, public records reflect that the Diocese is a religious nonprofit corporation.

22. The Operating Divisions are not incorporated. No Parish is incorporated and no High School is incorporated.

23. The Diocese asserts that its Parishes are "unincorporated associations,"[1] but the Parishes are not registered with the Vermont Secretary of State as required by 11 V.S.A. §1621. As a consequence, the Parishes may not maintain an action or raise a counterclaim, crossclaim, or affirmative defense in the State of Vermont pursuant to 11 V.S.A. §1626.

24. The Diocese similarly asserts that the High Schools are "unincorporated associations,"[2] but neither High School is registered with the Vermont Secretary of State as an unincorporated association. Instead, Rice is registered as an "assumed name" that is owned by the Bishop. The registration under an assumed name permits the Diocese to operate Rice in accordance with 16 V.S.A. §176.

25. Audited financial statements from the Diocese's Central Administrative Office, also known as the Chancery, consistently state that the audit does "not include[] certain activities or **operating divisions, such as the Diocesan schools**, the Diocesan cemetery, and The Catholic Center." (Emphasis added).

26. As recently as 2023, the audited financial statements of Rice expressly identify the High School as an operating division of the Diocese. Notes 1 and 2 to the audited financial statements of Rice state:

---

[1] *See, e.g., Affidavit of Bishop John J. McDermott in Support of Initial Pleadings* [Docket No. 13] ("First Day Declaration"), ¶16 ("[T]he individual parishes existed under civil law as unincorporated associations as part of the Diocese's civil corporation."); and *Emergency and Supplemental Motion for an Interim and Final Order Authorizing Continued Use of Existing Business Books, Etc.* [Docket No. 55] ("Emergency Motion"), ¶8 (referring to First Day Declaration and "individual parishes and certain schools existing under civil law as unincorporated associations").

[2] Emergency Motion [Docket No. 55], *supra* at ¶8; and *Joint Motion of Debtor and Rice Memorial High School to Pay Prepetition Claims* [Docket No. 372], ¶1.

> **Operations.** Rice Memorial High School (the School) ***is an operating division of Roman Catholic Diocese of Burlington, Vermont, Inc.*** (RCDB, Inc.) dedicated to operating a not-for-profit, grade 9 through 12 private high school in South Burlington, Vermont for students primarily from surrounding communities.
>
> **Scope of financial statements.** The accompanying financial statements include the assets, liabilities and financial activities of ***the School, an operating division of RCDB, Inc.*** These financial statements are not intended to include all of the activities of RCDB, Inc. Therefore, accounts of certain other activities of RCDB, Inc., including, but not limited to, the Administrative office, other diocesan schools, the diocesan cemetery, The Catholic Center, and Vermont Catholic Charities, Inc. (a wholly owned subsidiary of RCDB, Inc.), have been excluded. (Emphasis in bold italics added).

27. Neither the Parishes nor Mount St. Joseph prepare independent audited financial statements and, instead, they submit internal annual financial reports to the Diocese.

28. The Diocese identifies its Operating Divisions to third parties, including insurers and the federal government, as "part of" the Diocese.

29. The Operating Divisions are not individually tax exempt. They receive tax exempt status as "subordinate organizations" under the Diocese. Moreover, the Operating Divisions do not file tax returns separately from the Diocese. Instead, the Diocese files a combined Form 990-T (exempt organization return for unrelated business income) that includes non-religious business income generated by the Diocese's Operating Divisions.

30. The Diocese has not listed any of the assets of its Operating Divisions on its Schedules of Assets and Liabilities or Statement of Financial Affairs (Docket Nos. 92, 433) filed with the Bankruptcy Court as property of the estate, nor does it report the activities of its Operating Divisions on monthly operating reports filed with the Bankruptcy Court.

31. The Diocese continues to hold legal title to certain real property and accounts used by an Operating Division, yet the Diocese identifies the assets as not owned by the Diocese and held "in trust" for the benefit of the Operating Division.

### C. In 2006, the Diocese Created "Parish Trusts" to Shield Assets From Creditors.

32. Before 2006, all of the real and personal property associated with the Operating Divisions was owned by, and in the name of, the Diocese.

33. In 2006, the Diocese created individual Parish Trusts to hold the real and personal property used by 128 Parishes out of concern that the assets were exposed to the claims of

creditors, including the Survivors. The Parish Trusts were created by the Diocese, for the purpose of benefiting the Diocese, with the intent of insulating assets from the claims of creditors, all while the Diocese maintained control over and the benefit of such assets.

34. Bishop John J. McDermott, who was the Chancellor of the Diocese when the Parish Trusts were created, testified that the Diocese created the Parish Trusts due to "concern over parish properties being at risk in light of pending lawsuits" and, in part, to protect "those parish properties from the lawsuits."[3]

35. The pending lawsuits referenced by the Bishop included approximately nineteen (19) sexual abuse claims brought by former parishioners.

36. A letter from the then-Bishop Salvatore Matano, which was read and distributed at every Sunday Mass in or around May 2006, similarly explained the reason for the creation of the Parish Trusts: "[i]n such litigious times, it would be a gross act of mismanagement if I did not do everything possible to protect our parishes and the interests of the faithful from unbridled, unjust and terribly unreasonable assault."[4]

**The Diocese Is a Beneficiary of the Parish Trusts**

37. A form of the Declaration of Trust for a Parish Trust is attached as **Exhibit A**.

38. The Declaration of Trust for each Parish Trust expressly states that the Diocese is a beneficiary of the Parish Trust. Section 1.1, entitled Statement of Purpose, provides:

> (a) This trust shall function and shall at all times be operated exclusively for charitable, religious or educational purposes by conducting or supporting activities ***exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the Roman Catholic Church (as operated through the Catholic Diocese of Burlington, Vermont or its successor (the "Diocese")***, specifically in connection with Diocese operations within the territorial confines of the Parish (or in the event no territorial confines have been established for the Parish, or if the Trustee has determined that it is necessary or appropriate to suppress the Parish, that geographic area of the Diocese which is served by the non-territorial parish/charitable trust, as determined from time to time by the Bishop), including the advancement of religion within the Parish under the

[3] *Turner v. Roman Catholic Diocese of Burlington, Vermont*, Case No. S1020-04 Cnc, Sept. 26, 2007 Deposition of John McDermott, 30:22-31:8.

[4] *Turner v. Roman Catholic Diocese of Burlington*, 987 A.2d 960, 984 (Vt. 2009) (quoting May 8, 2006 letter from Bishop Matano).

> pastoral care of the Parish's own pastor. In the event the Parish ceases to be a "qualified organization," as hereinafter defined, the trust shall be operated exclusively for the benefit of, to perform the function of, or to carry out the purposes of one or more qualified organizations as shall be selected by the Bishop, as defined in Paragraph 4.3. An organization is a "qualified organization" for purposes of this trust only if it is described in Section 501(c)(3) and Sections 509(a)(1) or (2) of the Internal Revenue Code. (Emphasis added).

39. The stated purpose of each Parish Trust is to support and carry out the activities of the Diocese alone.

40. The Declaration of Trust for each Parish Trust expressly states that the Parish does not have any specific right to use, control, or own the trust assets. Section 1.1 of the Declaration of Trust, entitled Statement of Purpose, continues:

> (b) ***Nothing herein shall be construed as granting the Parish specific rights to assets of this trust*** (for instance, use of trust assets to or for the benefit of the Parish might be postponed, limited, or terminated if the Trustee determine it is necessary and appropriate to suppress the Parish). ***Further, in no circumstance will the congregation of the Parish*** (or individual members thereof or groups of members thereof) ***be considered or deemed to be beneficiaries of this trust or to have any specific rights to assets of this trust.*** (Emphasis added).

**The Bishop Controls the Trust Assets**

41. Section 3.1 of the Declaration of Trust for each Parish Trust names the Bishop as the trustee ("Parish Trustee") who exercises dominion and control over the trust assets.

42. The Parish Trustee (Bishop)'s powers and authority are set forth at Exhibit C to the Declaration of Trust for each Parish Trust and include, without limitation, borrowing money, suing, defending, or compromising lawsuits, and generally managing the trust estate.

43. Section 3.2 of the Declaration of Trust specifies that "Nothing in this Declaration of Trust shall in any way be construed to limit the Trustee's authority or that of his successors as Trustee to consolidate, merge, modify or terminate the existence of the trust [Parish Trust] in conformity with the law of the State of Vermont."

44. By contrast, the Parish has no powers or authority under the Parish Trust except as approved by the Parish Trustee (Bishop). Pursuant to section 3.4(d) of the Declaration of Trust, to the extent that a Parish pastor may manage the operations of a Parish Trust, he does so at the sole discretion of the Parish Trustee (Bishop) and may be removed at any time.

45. The Declaration of Trust for each Parish Trust was signed by then-Bishop Matano on behalf of the Diocese as the settlor and grantor of each trust, witnessed by current-Bishop McDermott.

46. The Declaration of Trust was not signed by the named Parish in any capacity.

47. Each Parish Trust is terminable by the Parish Trustee (Bishop). Section 1.4 of the Declaration of Trust, entitled Termination of Trust, allows the Parish Trustee (Bishop) to terminate a trust, for example, "if the [Parish] Trustee determines that it is necessary or appropriate to suppress the Parish."

48. Accordingly, the Parish Trustee (Bishop) retains power, not only over disposition of the assets of the Parish Trust but over the existence of the Parish for whom it is named.

49. Section 4.1 of the Declaration of Trust, entitled Limited Power of Amendment, states that the Parish Trust is irrevocable, meaning that it is a trust that cannot be modified, amended, or terminated without the consent of the beneficiary or a court order.

50. However, as set forth in section 1.4 of the Declaration of Trust, the Parish Trust is terminable at the discretion of the Parish Trustee (Bishop) and expressly subject to amendment by the Parish Trustee (Bishop). Upon termination of the Parish Trust, the Parish Trustee (Bishop) has sole discretion regarding disposition or transfer of the assets to another organization "affiliated" with the Diocese.

**The Diocese Transferred Assets Worth Millions to the Parish Trusts**

51. In or about May 2006, the Diocese, as settlor of the Parish Trusts, transferred real property and investment assets valued in the aggregate at hundreds of millions of dollars (collectively, the "<u>Transfers</u>") to the Parish Trusts. The Diocese's property insurance schedule as of April 2006 lists each Parish by location and ascribes a "total replacement cost" to the Parish properties of $405 million.

52. In 2020, then-Bishop Christopher Coyne asked a candidate for the position of Chief Financial Officer of the Diocese whether she would be willing to help the Diocese shelter assets from survivors in preparation for filing bankruptcy. Within four years of the Petition Date and as recently as January 2024, the Diocese continued to transfer diocesan assets ("<u>Additional</u>

Transfers") to the Parish Trusts for little or no consideration for the purpose of shielding assets from Survivors.

53. Section 1.2 of the Declaration of Trust of each Parish Trust, entitled Trust Assets, and Exhibit A thereto identify the real and personal property, funds, and accounts of the Parish Trust. The cover page to the exhibit states, "See Deed Into Trust."

54. A form of the Deed Into Trust is attached hereto as **Exhibit B**.

55. The Deed Into Trust recites that the Diocese made the Transfers to the Parish Trust "in consideration of One Dollar." Accordingly, the Transfers were made for nominal or no consideration.

56. The Deed Into Trust identifies the Diocese as the Grantor, and the Bishop in his capacity as Parish Trustee as the Grantee of the Transfers.

57. The Deed Into Trust was signed by the Vicar General on behalf of the Diocese and witnessed by current-Bishop McDermott.

58. The Deed of Trust was not signed by the named Parish in any capacity.

59. The Diocese did not obtain fairness opinions or engage outside accountants or professionals to conduct a solvency analysis in connection with the Transfers.

60. On information and belief, real property associated with the Parishes is currently titled in the name of the Parish Trusts, but real property associated with the High Schools remains titled in the name of the Diocese. Some, but not all, of the cash and investment assets associated with the Operating Divisions is titled in the name of the Parish Trusts.

**Creditors of the Diocese as of the Petition Date**

61. Pursuant to Bankruptcy Code section 544(b)(1) and the Standing Order, the Committee may avoid any transfer of an interest in the Diocese's property that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code.

62. On the date of the Transfers and Additional Transfers, the Diocese was obligated to both "present" and "future" creditors as those terms are used in Vermont's Uniform Voidable

Transactions Act. Each Survivor in this case holds an unsecured claim that arose prior to the date of the Transfers and Additional Transfers that is allowable under Bankruptcy Code section 502.

63. At least one or more Survivors holds an allowable claim as of the Petition Date and had no knowledge of the Transfers or Additional Transfers on the date of the transaction and could not have reasonably discovered the existence, let alone the fraudulent nature, of the Transfers prior to one year before the Petition Date. Such Survivors had no knowledge of the Transfers or Additional Transfers because they moved out of state, no longer attended church or received local news or church announcements, and simply did not have access to the Diocese's financial information. Such Survivors had no knowledge of facts or circumstances that would cause a reasonable person in their position to inquire regarding the existence or the fraudulent nature of the Transfers or Additional Transfers.

64. To the extent that some Survivors knew about the Transfers, they could not pursue fraudulent transfers as creditors of the Diocese until after July 1, 2019 because Vermont had not passed legislation ("Windows Legislation") to allow lawsuits for sexual abuse claims that were previously time-barred.

## D. The Parishes Are Not Separate Legal Entities. They Are Operating Divisions of the Diocese.

65. The Diocese's restructuring and transfer of both real and personal property to the Parish Trusts did not alter the identity of the Parishes or the Diocese's control of its Parishes. Since the creation of the Parish Trusts, the Parishes continue to operate as unincorporated divisions of the Diocese.

66. Like operating divisions in any other large corporation, the Parishes have authority over some functions to the extent it is delegated by the Diocese, but their limited Diocese-delegated power is not the same as holding the rights of an independent legal entity.

67. The Bishop's control over the Parishes includes required financial reporting, periodic audits, approval for significant expenditures, and centralized policies and procedures.

68. The Diocese promulgates extensive policies governing the Parishes' operations, including the *Parish Finance & Administrative Manual* ("Parish Manual"). Examples of provisions applicable to the Parishes under the Parish Manual include the following:

- The Bishop must approve the opening of any investment account by a Parish.
- Parishes are required to implement "all parish policies, procedures, and guidelines *as defined by the Diocese*."[5]
- Parishes must administer "the lay personnel policies *of the Diocese* (hiring, terminating, performance evaluations, etc.)."[6]
- Parishes must provide regular reports to the Bishop. The Bishop must consent to major decisions regarding Parish finances, fundraising, real estate transactions, or capital expenditures.
- The Diocese performs periodic reviews and tests financial controls and compliance by the Parishes with its finance and administrative procedures.
- The Diocesan Building Commission and Bishop must approve all Parish capital projects.
- Parishes must participate in a coordinated payroll system administered by the Diocese.
- The Diocese dictates how, and how often, Parish employees are paid.
- Changes to Parish construction projects must receive approval by the Bishop and the Diocese's attorney when deemed necessary by the Bishop.
- All individual gift requests over $10,000 must be submitted to the Diocesan Development Office for review.
- Each Parish must follow established internal accounting controls to facilitate reporting to the Diocese.

---

[5] *See*, *e.g.*, Parish Manual, chpt. II, §3.3 (emphasis added).

[6] *Id.*

- Each Parish must follow a uniform chart of accounts and use uniform codes for categories and subcategories of assets, liabilities, revenues, and expenses.
- Each Parish must submit annual financial reports to the Diocese in a uniform format that is subject to a review process conducted by accountants selected by the Diocese.
- Each Parish must transfer any "excess" cash (which the Diocese defines as more than two months of operating cash) to the Deposit and Loan Fund or a pooled investment account.

69. In addition, each Parish must implement the practices and procedures set forth in the Diocese's *Parish H.R. Policies and Procedures*.

**E. The Parishes Have No "Independent" Governance**

70. Each Parish is led by that Parish's pastor, who is assigned to that Parish by the Bishop. According to the Parishes' counsel, the Parishes have "no authority" to "manage, supervise or otherwise control the priests."[7]

71. A pastor can be removed from his position only by the Bishop at his discretion.

72. The Parish Manual states that a pastor, who is appointed by the Bishop, "exercises the pastoral care of the community [Parish] entrusted to him *under the authority of the Diocesan Bishop*."[8]

73. The Parish pastors and "any additional parish clergy are appointed by the Bishop and overseen by him."[9]

74. Parish counsel similarly asserts that the Parish pastors are employees of the Diocese, not their respective Parish, and only have the authority delegated to them from the Diocese.

---

[7] *Plaintiff v. Christ the King Parish in Rutland, et al*., Case No. 25-CV-05690, Defendants' Reply in Support of Motion to Dismiss, p. 10.

[8] *Id.* at p. 11.

[9] *Id.* at p. 12.

75. Further, the Parishes' governance structure is purely consultative. "Parishioners can participate in the Parish Finance Committee which '[i]s a consultative body of lay persons mandated by the *Code of Canon Law* to advise the pastor in matters pertaining to the financial affairs of the parish. . . ."[10] The Diocese policies that govern the Parishes, however, make clear that the Parish Finance Committee's "advisory role is only that, and the pastor [a Diocesan controlled-employee] has the ultimate authority."[11]

76. The Parish Pastoral Council is similarly consultative.[12]

77. The Diocese has asserted in pleadings in the Bankruptcy Court that the Parishes are "separate" and operate as "unincorporated associations" under civil law. The Committee disputes these assertions both as a matter of fact and based on applicable law.

**F. The High Schools Are Not Separate Legal Entities. They Are Operating Divisions of the Diocese.**

78. The two High Schools of the Diocese are not associated with any particular Parish. Audited financial statements of Rice confirm its status as an Operating Division of the Diocese, consistent with the financial statements from the Chancery. Notes to financial statements for Rice confirm that it is an "operating division" of the Diocese.

79. The Diocese administers and processes all payroll and insurance for the High Schools.

80. The Diocese's amended schedules confirm that the Diocese holds title to the High Schools' bank and investment accounts. Thus, for example, six checking accounts used by Rice are held by the Diocese dba Rice.

81. The Diocese's amended schedules confirm that the Diocese holds title to the real property on which both High Schools operate.

---

[10] *Id.* at p. 10.

[11] *Id.*

[12] *Id.* at p. 11.

82. Bishop McDermott has previously testified in deposition that the "Diocese owns Rice High School."

83. The Diocese has asserted in pleadings in the Bankruptcy Court that the High Schools are "separate" and operate as "unincorporated associations" under civil law. The Committee disputes these assertions both as a matter of fact and based on applicable law.

**FIRST CLAIM FOR RELIEF**
**Declaratory Relief Regarding Operating Division Status**
**(Bankruptcy Code § 541, 28 U.S.C. §§ 2201 and 2202)**
**Against All Defendants**

84. The Committee re-alleges each of the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

85. The Diocese asserts that its Operating Divisions are unincorporated associations under Vermont law.

86. An actual, substantial, and justiciable controversy exists between the Committee and the Diocese concerning the status of the Operating Divisions and whether these entities are unincorporated associations as the Diocese contends or, in fact, are merely unincorporated operating divisions of the Diocese that use diocesan property that is subject to the claims of the Diocese's creditors, including the Survivors.

87. The Committee respectfully prays for a declaration that the Operating Divisions, comprised of the Parishes and the High Schools, are unincorporated operating divisions of the Diocese, not separate legal entities.

**SECOND CLAIM FOR RELIEF**
**Declaratory Relief That Assets of the Operating Divisions Are Estate Property**
**(Bankruptcy Code § 541, 28 U.S.C. §§ 2201 and 2202)**
**Against All Defendants**

88. The Committee re-alleges each of the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

89. To date, the Diocese has not disclosed the assets of the Operating Divisions on its Schedules of Assets and Liabilities, Statement of Financial Affairs, or Monthly Operating Reports, and to the extent that title to certain assets remains in the name of the Diocese, the

Diocese asserts that the assets are held "in trust" for the alleged benefit of the Operating Divisions.

90. The Committee seeks a declaration that all assets of the Operating Divisions, whether in the name of the Diocese, an Operating Division, or a Parish Trust, are, in fact, property of the estate under Bankruptcy Code section 541.

91. The Committee needs such relief in order to clarify the scope of the estate in compliance with the Bankruptcy Code. Among other matters, such relief is appropriate (i) to obtain updated and amended schedules and operating reports that identify estate property in compliance with Bankruptcy Code sections 521 and 704(a)(8); (ii) to obtain "information concerning the estate and the estate's administration" in accordance with Bankruptcy Code section 704(a)(7); (iii) to facilitate notice and a hearing prior to the use, sale, or lease of estate property outside the ordinary of business in accordance with Bankruptcy Code section 363(b)(1); (iv) to establish the value of estate property subject to any plan of reorganization and satisfaction of the confirmation requirements under Bankruptcy Code section 1129, including but not limited to the "best interest of creditors test" under Bankruptcy Code section 1129(a)(7); (v) to determine the scope of any discharge under Bankruptcy Code section 524; and (vi) to challenge the validity of any alleged self-settled spendthrift trusts under applicable Vermont law.

92. An actual, substantial, and justiciable controversy exists between the Committee and the Diocese concerning the ownership of real and personal property allegedly held by the Operating Divisions as unincorporated associations or in trust for their benefit. The Committee contends that assets of the Diocese held for the alleged benefit of the Operating Divisions are, in fact, owned by the Diocese and are property of the estate.

93. The Committee respectfully prays for a declaration that any assets of the Diocese allegedly held for the benefit of the Operating Divisions are property of the bankruptcy estate and are subject to the claims of the Diocese's creditors, including the Survivors, and that the Operating Divisions—as part of the Diocese—must comply with all Bankruptcy Code requirements of debtors-in-possession.

## THIRD CLAIM FOR RELIEF

**Declaratory Relief That the Parish Trusts Are Self-Settled Trusts and That Their Assets Are Property of the Bankruptcy Estate (Bankruptcy Code § 541; 14A V.S.A. § 505; 28 U.S.C. §§ 2201 and 2202) Against All Defendants**

94. The Committee re-alleges each of the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

95. Each Parish Trust was created and funded by the Diocese. The Diocese is therefore the settlor of each Parish Trust.

96. The Diocese is an express beneficiary of each Parish Trust. Under the terms of each Parish Trust, no person or entity other than the Diocese—acting through the Bishop as Parish Trustee—has any legally enforceable interest in the trust assets.

97. Under 14A V.S.A. §505(a)(1), irrespective of any spendthrift provision, the property of a revocable trust is subject to the claims of the settlor's creditors.

98. Under 14A V.S.A. § 505(a)(2), irrespective of any spendthrift provision, the property of an irrevocable trust is subject to the claims of the settlor's creditors to the maximum extent that the settlor is a beneficiary of the trust.

99. Because the Diocese is the settlor and beneficiary of each Parish Trust, each Parish Trust is subject to the claims of the Diocese's creditors under Vermont law.

100. An actual, substantial, and justiciable controversy exists between the Committee and the Diocese regarding the validity of the Parish Trusts, the effectiveness of any purported transfer of assets to those trusts, and whether those assets constitute property of the bankruptcy estate available to satisfy the claims of the Survivors.

101. The Committee respectfully prays for a declaration that each Parish Trust is a self-settled trust under Vermont law, the assets of which are subject to the claims of the Survivors, pursuant to 14A V.S.A. § 505.

**FOURTH CLAIM FOR RELIEF**
**Avoidance and Recovery of the Transfers as Intentionally Fraudulent**
**(Bankruptcy Code §§ 544(b) and 550; 9 V.S.A. §§ 2285-2295)**
**Against the Bishop as Parish Trustee**

102. The Committee re-alleges each of the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

103. The Transfers, including Additional Transfers, were fraudulent as to present and future creditors pursuant to 9 V.S.A. section 2288(a)(1) because the Diocese made the Transfers with intent to hinder, delay or defraud the Diocese's creditors, including, but not limited to, the Survivors who had (and still have) sexual abuse claims against the Diocese.

104. Each Parish Trust is an initial transferee of the Transfers and Additional Transfers.

105. The Transfers exhibited multiple badges of fraud establishing the Diocese's actual intent to hinder, delay, or defraud its creditors. In addition to unequivocal statements made by the current and former Bishops that the Transfers were intended to shield assets from creditors, the following facts are indicative of fraudulent intent:

a. The Transfers were made in exchange for negligible consideration to the Diocese that was not reasonably, or even remotely, equivalent to the value of the assets transferred.

b. The Transfers were made to an insider of the Diocese: the Bishop is the President and highest official of the Diocese, the Bishop exercises control over the Diocese and each of its Operating Divisions, and the Bishop is the designated Parish Trustee.

c. The Diocese retained the use, control, and benefit of the assets transferred to each Parish Trust pursuant to the trust terms and the authority of the Parish Trustee (Bishop).

d. The purpose of each Parish Trust is for the benefit of, and to carry out the purposes of, the Diocese.

e. Before the Transfers were made, the Diocese was subject to pending and threatened litigation for sexual abuse damages.

f. The Transfers occurred shortly after the Diocese settled a single sexual abuse lawsuit for almost $1 million, which was paid by the Diocese using a line of credit.

g. The Transfers were substantially all of the Diocese's financial and real estate assets.

h. The Transfers were not made in the ordinary course of business or financial affairs of the Diocese. Yet the Diocese did not engage outside attorneys or accountants to evaluate the terms of the transaction or to conduct a solvency analysis regarding the effect of the Transfers.

i. The Diocese became insolvent shortly after the Transfers were made.

j. The Transfers were based on similar "restructurings" implemented by other Catholic dioceses within the United States in response to escalating exposure to claims arising from sexual abuse of children by clergy and extended limitation periods for Survivors to bring suit.

106. The Parish Trusts did not receive the Transfers or Additional Transfers in good faith as required for a defense to liability under 9 V.S.A. section 2292 because the Parish Trustee (Bishop) knew that the Transfers were intended to shield the assets from the reach of creditors.

107. By reason of the foregoing, the Committee, on behalf of the Diocese's estate and for the benefit of unsecured creditors, is entitled to recover the Transfers and Additional Transfers, or the value thereof, pursuant to Bankruptcy Code section 550 and 9 V.S.A. section 2291.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**Avoidance and Recovery of the Transfers as Constructively Fraudulent**
**(Bankruptcy Code §§ 544(b) and 550; 9 V.S.A. §§ 2285-2295)**
**Against the Bishop as Parish Trustee**

108. The Committee re-alleges each of the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

109. The Diocese did not receive reasonably equivalent value in exchange for the Transfers or Additional Transfers to the Parish Trusts.

110. The Transfers, including Additional Transfers, were fraudulent as to present or future creditors pursuant to 9 V.S.A. sections 2288(a)(2)(A) and 2289 because the Transfers and Additional Transfers were made by the Diocese without receiving a reasonably equivalent value in exchange therefor when the Diocese was engaged or about to engage in a business transaction for which the remaining assets of the Diocese were unreasonably small in relation to the business transaction.

111. Alternatively, the Transfers and Additional Transfers were fraudulent as to present or future creditors pursuant to 9 V.S.A. sections 2288(a)(2)(B) and 2289 because the Transfers were made by the Diocese without receiving a reasonably equivalent value in exchange therefor when the Diocese intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

112. The Parish Trusts are the initial transferee of the Transfers and Additional Transfers.

113. By reason of the foregoing, the Committee, on behalf of the Diocese's estate and for the benefit of unsecured creditors, is entitled to recover the Transfers and Additional Transfers, or the value thereof, pursuant to Bankruptcy Code section 550 and 9 V.S.A. section 2291.

## SIXTH CLAIM FOR RELIEF
**Turnover of Assets Held in the Parish Trusts and Otherwise Held "In Trust" for the Benefit of the Operating Divisions (Bankruptcy Code §§ 541, 542, and 544; 14A V.S.A. §505) Against the Diocese and Bishop, as Parish Trustee**

114. The Committee re-alleges each of the allegations contained in each preceding paragraph of this Complaint as though fully set forth herein.

115. The Operating Divisions are not legally separate civil entities from the Diocese. All assets held for the benefit of the Operating Divisions, whether legally titled in the name of the Diocese or a Parish Trust, are property of the Diocese and its bankruptcy estate.

116. Even if the Operating Divisions have a separate civil existence from the Diocese, which the Committee disputes, the Parish Trusts are subject to the claims of the Diocese's creditors and part of the bankruptcy estate pursuant to 14A V.S.A. section 505 because the Diocese is both the settlor and beneficiary of each Parish Trust.

117. All assets held for the benefit of the Operating Divisions and all assets held by the Parish Trusts should be deemed subject to the claims of the Diocese's creditors and to constitute property of the bankruptcy estate pursuant to Bankruptcy Code section 541(a).

118. The Committee respectfully prays for an order pursuant to Bankruptcy Code section 542(a) compelling the Bishop, on behalf of the Diocese and in his capacity as Parish Trustee, to deliver to the bankruptcy estate and account for all assets held for the benefit of the Operating Divisions and all assets held in the Parish Trusts.

**WHEREFORE**, the Committee prays for judgment as follows:

- a declaration that, as of the Petition Date, each of the Operating Divisions was, and is, an unincorporated division of the Diocese;
- a declaration that all assets associated with the Operating Divisions, whether titled in the name of a Parish Trust or otherwise, constitute property of the estate;
- a declaration that each Parish Trust is a self-settled trust under Vermont law, the assets of which are subject to the claims of the Diocese's creditors, including the Survivors, pursuant to 14A V.S.A. section 505;
- that the Transfers and all Additional Transfers to the Parish Estates are avoidable and may be recovered by the bankruptcy estate pursuant to 9 V.S.A sections 2285 *et seq.*;
- for turnover of assets associated with the Operating Divisions and all assets held in the Parish Trusts; and

- for such other and further relief as the Court may deem just and proper.

Date: July 31, 2026

Respectfully submitted,

*/s/Paul A. Levine*

Paul A. Levine, Esq.
**LEMERY GREISLER LLC**
677 Broadway, 8th Floor
Albany, New York 12207
Telephone: (518) 433-8800
Email plevine@lemerygreisler.com

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (Admitted *Pro Hac Vice*)
Brittany M. Michael (Admitted *Pro Hac Vice*)
Gail Greenwood (Admitted *Pro Hac Vice*)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone: (212) 561-7700
Email: jstang@pszjlaw.com
bmichael@pszjlaw.com
ggreenwood@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*